UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSEPH WILLIAM FRIEDL and BEVERLY FRIEDL | ) ) ) | CIV. 03-4198-KES |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| FORD MOTOR CO., a Delaware Corporation, | ) ) ) ) | ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| Defendant and Third-Party Plaintiff, | ) ) ) ) | |
| vs. | ) ) | |
| CATHY ANN LINDQUIST, | ) ) | |
| Third-Party Defendant. | ) | |

Plaintiff Joseph William Friedl (Friedl) was severely injured when he was hit by a 1997 Ford Explorer driven by Cathy Ann Lindquist. Plaintiffs allege that a defective cruise control system caused the accident, and they seek compensatory damages, punitive damages, costs and attorneys' fees. Defendant, Ford Motor Company, moves for partial summary judgment regarding the punitive damages claim. Ford's motion for partial summary judgment is denied.

**BACKGROUND**

The evidence, viewed in the light most favorable to the nonmoving party, plaintiffs, is:

On August 19, 2000, Friedl was loading suitcases into the trunk of his taxi at the Sioux Falls Sheraton Hotel. As Lindquist was pulling up to the hotel in her 1997 Ford Explorer, she lost control of the vehicle and struck Friedl from behind. Friedl was pinned between the SUV and his taxi, and allegedly suffered severe, permanent leg injuries.

Friedl alleges that Ford uses an inherently flawed cruise control system that can cause a vehicle's throttle to suddenly open wide, as if the driver had "floored" the gas pedal. When a car's engine is at wide-open throttle (WOT), the engine does not produce the vacuum that normally provides the power assist to the brakes. Pl. Ex. 9 at 2-3. Without the power assist, some drivers will be unable to apply enough pressure to the brake pedal to stop the car. Id. In order to stop the car, the driver must either shift into neutral or turn off the engine. This phenomenon is known as "sudden acceleration." Friedl alleges that the defective cruise control system in Lindquist's Ford Explorer caused the vehicle to surge out of control and crash into him.

Friedl contends that the cruise control system is the only vehicle component whose malfunction can cause sudden acceleration. Friedl alleges that sudden acceleration is caused by the unintended completion of an electronic circuit in the cruise control system, which sends a signal to the throttle to open wide. Nicked wires, transient electrical signals generated within the vehicle, or "cross talk" between components can cause the

completion of these electronic circuits. The only other way a car can suddenly and unintentionally accelerate is if the driver accidentally pushes the accelerator pedal to the floor. Friedl argues that because sudden acceleration incidents increased with the advent of electronic engine controls in the early 1980s that they must be caused by an undetectable defect in the car rather than driver error, because the skill of the average driver could not have changed so much since the early 1980s.

Dozens of 1997 Ford Explorer owners have complained to the National Highway Transportation Safety Administration (NHTSA) about sudden acceleration incidents. In one incident, the driver reported that the Explorer began to accelerate when the driver's foot was on the brake pedal, and only extreme braking effort prevented an accident. Pl. Ex. 7 at 3. The Ford dealer could find nothing wrong with the vehicle. Id. In another alleged incident, the "consumer was at a complete stop with her foot on the brakes, all of a sudden the vehicle lurched forward, resulting in a collision." Id. at 4. Another Ford customer reported that the cruise control accelerated the Explorer even after the cruise control was disengaged, and that the brakes did not work. Id. at 8. The driver was able to stop the car by putting it in neutral. Id.

Beginning in the mid 1980s, NHTSA investigated the growing number of reported incidents of sudden acceleration involving cars equipped with automatic transmission and cruise control. The Transportation Systems

Center (TSC) completed a study for NHTSA which focused on ten models that had above average sudden acceleration complaints. The study did not include any Fords. TSC tested cruise control systems under stress from temperature extremes, power supply variations, high-voltage discharges, and electromagnetic interference, and found "no failure modes of any relevance to [Sudden Acceleration Incidents]." Transp. Sys. Ctr., U.S. Dep't of Commerce, Examination of Sudden Acceleration, viii (1989). Analysis of cruise control circuitry showed that "for nearly all controls designed in the past few years, two or more independent, intermittent failures would have to occur simultaneously to cause throttle opening in a way that would be difficult to detect after the incident." Id. The TSC characterized such undetectable, simultaneous failures as "virtually impossible" and found that pedal misapplication was the cause of the vast majority of sudden acceleration incidents. Id. at viii-x.

Following a 1995 accident allegedly caused by sudden acceleration in a 1988 Lincoln Town Car, NHTSA considered a petition to reopen its investigation. In 1999, the NHTSA denied the petition after it reviewed consumer complaints; investigated the alleged sudden acceleration crash of the Lincoln Town Car; reviewed information gathered in prior investigations; inspected various Ford vehicles; reviewed a report Ford produced based on its own investigation, a paper on human factors in sudden acceleration incidents;

and reviewed several other reports on sudden acceleration. NHTSA, Dep't of Transp., Denial of Petition for a Defect Investigation, 4-6 (2000). NHTSA inspected and road tested the Lincoln Town Car involved in the accident and also disassembled a mechanical vacuum dump valve (MVDV) to learn more about its operation. This part is a component of cruise control systems installed in 1982-2000 model year Ford Crown Victoria, Mercury Grand Marquis, and Lincoln Town Car. Denial of Petition for a Defect Investigation, at 5, 21-23. If this part fails at the same time that an intermittent electrical failure occurs, and at the same time that the brakes fail, the vehicle can suddenly accelerate and the driver will be unable to stop the car by pushing the brake pedal. Id. at 14-15, 23-24.

NHTSA found no reason to reopen the investigation. There was no credible evidence of "simultaneous, undetectable, electrical and mechanical failures, in any vehicle (including Fords)." Id. at 14. NHTSA specifically discredited the theory that defective cruise control could lead to sudden acceleration because even if an undetectable electronic failure caused the engine to surge, this would not account for the alleged brake failure that accompanies these incidents. Moreover, in Ford cruise control devices, the MVDV serves as a pneumatic fail-safe mechanism that will disengage the cruise control when the driver touches the brake pedal, even if the electrical system has failed. Id. at 22-23. Any defect or failure in the MVDV that could

5

prevent the cruise control from disengaging would "not be self-correcting and would be easily detected during a vehicle inspection." Id. at 22.

Friedl contends that Ford was aware that electromagnetic interference could cause its vehicles to accelerate out of control, and that despite its awareness of the dangers, it continued to sell vehicles equipped with the faulty cruise control. A summary of Ford's internal investigation of sudden acceleration noted the "increasing numbers of reports with introduction (1984) of broadly applied electronics." Pl. Ex. 5 at 3. In December of 1989, Ford's Electronics Division prepared a Potential Failure Mode and Effects Analysis to identify the effects of electronic failures in the cruise control system. It noted that a "collector/emitter short" could cause acceleration. Pl. Ex. 8. A Ford "Fault Tree" analysis lists "EMI" (electromagnetic interference) as a potential cause of "sustained unintended near WOT." Pl. Ex. 5 at 2.

In addition to complaints reported to the NHTSA, Ford customers have reported sudden acceleration to Ford dealers and to the company itself. In one reported incident, a 1984 Mercury Grand Marquis "suddenly accelerated to W.O.T.," with the wheels spinning while the driver pressed the brake pedal. Pl. Ex. 14. The dealer replaced "the speed control servos." Id. In March of 1994, an owner of a 1989 Ford Thunderbird alleged the vehicle "self accelerated" three or four times and that the gas pedal was "being pulled to the floor." Pl. Ex. 13 at 1. The Thunderbird owner reported that pressing the

6

brake pedal did not bring the vehicle under control, and that he or she had to shut the engine off in order to do so. Pl. Ex. 13 at 1. Ford's technical service hotline recommended that the dealer inspect the cruise control system and disconnect and retest its components. Id.

In September of 1994, the owner of a 1992 Lincoln Town Car took it to the dealer after it had allegedly accelerated by itself twice, with the gas pedal moving down on both occasions. Id. at 2. One incident occurred when stopped at a traffic light and the other took place while the car was at highway speed. Id. Ford's technical service hotline advised the dealer that "the only thing that will cause the accelerator pedal to move down by itself is the speed control system." Id. The dealer was advised to check with the customer again to verify that the gas pedal had moved by itself, and if so, the dealer was advised to check "the speed control wiring/connections/pins/crimps. Check the switch voltage inputs. Check the wiring between the servo and amplifier for possible shorts." Id. The dealer had driven the car 300 miles over the previous three weeks, but was unable to verify the sudden acceleration problem. Id. Another Ford customer reported several cases of unintended acceleration in a 1987 Ford Ranger. Id. at 3. After placing the truck in gear and touching the gas pedal, the pedal "allegedly moves down by itself and truck 'shoots forward.'" After disconnecting the cruise control, no further incidents took place. Pl. Ex. 13 at 3.

7

Casey Mulder, a Ford engineer, inspected a Ford Expedition that had a problem with unintended acceleration caused by defective cruise control. Pl. Ex. 9 at 1. He reported that when the "resume" button was pressed, "the vehicle kept accelerating beyond the set speed and wouldn't respond to brakes or off switch. We looked at the truck and, as usual, saw nothing out of the ordinary." Id. Mulder also reported that a Ford vice-president had crashed his Lincoln Navigator into a telephone pole due to unexplained acceleration. Id.

Other Ford employees have reported sudden acceleration in Ford products. Jack Caldwell, a Ford employee, reported an incident involving his first test drive of a 1992 Mercury Grand Marquis. As soon as he shifted into "drive" the engine raced and the wheels began to spin, as if he had floored the accelerator. Pl. Ex. 32 at 2. Caldwell did not recall putting his right foot on the accelerator, and does not normally race the engine as he is shifting from "park" to "drive." Id. He reported that if he had done this for some reason, he would have heard the engine racing. Id. He was able to stop the car by braking as hard as he could, and afterwards the car seemed normal. Id. at 1.

R.C. Kosik, another Ford employee, crashed an experimental Ford Aerostar prototype vehicle in a company parking garage after it accelerated unexpectedly. Pl. Ex. 31 at 1. After shifting into gear, it accelerated "at a very full throttle condition, squealing the tires at its initial movement." Pl. Ex. 1 at

8

1. Thinking that he may have accidentally floored the accelerator, Kosik removed his foot from the pedals, but the van continued to accelerate. Id. He shifted into park but was unable to avoid crashing into a wall. Id. Ford CEO William Clay Ford was allegedly involved in a sudden acceleration incident and asked for a briefing on how the company handled sudden acceleration cases. Pl. Ex. 4.

Ford owns two patents for safety mechanisms designed to prevent uncontrolled vehicle acceleration caused by faulty cruise control systems. See Pl. Ex. 11 at 8, Pl. Ex. 12 at 3. One such patent contains the following description of the "prior art" of vehicle speed control systems:

> In some known speed control systems, battery voltage is applied to the solenoids controlling the vacuum valves and the vent valves at all times. This means that <u>a short to ground in the electrical lines going to the vacuum and vent solenoids would activate the actuator chamber even if the speed control module were turned off.</u> In fact, a short in both the lines to the vacuum and vent solenoids at the same time would cause the speed control actuator chamber to go to a state where the vacuum solenoid is energized causing the vacuum valve to be open and the vent solenoid is energized causing the vent valve to be closed. <u>As a result . . . the throttle is pulled to an open throttle position</u>, an undesired condition when the speed control module is turned off. These are some of the problems this invention overcomes.

U.S. Patent No. 4,549,266 (issued October 22, 1985) (emphasis added). Pl. Ex. 12 at 3.

**LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set

forth specific facts by affidavits or otherwise showing that genuine issue exists. Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

## DISCUSSION

Claims for punitive damages are prohibited in South Dakota unless authorized by statute. Dahl v. Sittner, 474 N.W.2d 897, 900 (S.D. 1991) (citing SDCL 21-1-4). The jury may award punitive damages in "any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed." Id. (citing SDCL 21-3-2). Presumed, legal malice may be inferred when the defendant acts willfully or wantonly to the injury of another. Id. The South Dakota Supreme Court defined malice in the context of SDCL 21-3-2 as "not simply the doing of an unlawful or injurious act, it implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations." Id. (quoting Hannahs v. Noah, 158 N.W.2d 678, 682 (S.D. 1968)). Willful and wanton misconduct is behavior that demonstrates the defendant "consciously realized that his conduct would in all probability, as distinguished from possibility, produce the precise result which it did produce and would bring harm to the plaintiff." Flockhart v. Wyant, 467 N.W.2d 473, 478 (S.D. 1991) (affirming punitive damages award where defendant crashed her car after driving 50 miles on the interstate with a blood alcohol level of .30).

A punitive damages claim may not be submitted to the jury unless the court finds by clear and convincing evidence "that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against." SDCL 21-1-4.1. This determination may be made at the close of evidence. Kieser v. Southeast Properties, 566 N.W.2d 833, 840 (S.D. 1997). In construing SDCL 21-4-4.1 and 21-3-2 together, the "willful, wanton" language of 21-4-4.1 is equivalent to the presumed legal malice of 21-3-2. Dahl, 474 N.W.2d at 900. Section 21-1-4.1 does not alter the standard of proof required to recover on a punitive damages claim. Dahl, 474 N.W.2d at 902. "It is a procedural statute." Id. Accordingly, the court will consider whether a reasonable jury could find malice by a preponderance of the evidence, rather than consider whether there is clear and convincing evidence that there is a reasonable basis to find malicious conduct.

Ford argues it is entitled to summary judgment because Friedl's evidence merely demonstrates that Ford was aware of the possibility that a defect in its cruise control design could cause sudden acceleration. To recover punitive damages, Friedl must show that Ford either knew or "must have known" that its cruise control caused sudden acceleration and decided to sell the defective cars anyway. See Flockhart, 467 N.W.2d at 478.

Viewing the evidence in the light most favorable to Friedl, a reasonable jury could find that Ford knew that its vehicles could suddenly accelerate and

cause accidents like the one that injured Friedl.  As noted above, Ford has received dozens of complaints from its customers about sudden acceleration, including allegations that Ford drivers saw the gas pedal moving by itself as the vehicle accelerated.  The only part of the car that can cause the accelerator pedal to move on its own is the cruise control system.  Friedl has offered evidence that Ford employees personally experienced Ford vehicles accelerating out of control and crashing for no apparent reason.  Ford has patented a safety mechanism to address sudden acceleration caused by short circuits in the cruise control mechanism, which supports Friedl's theory that intermittent, electrical failures in Ford cruise control systems can lead to sudden acceleration in Ford vehicles.

   Ford argues that it could not have been aware that its vehicles were likely to suddenly accelerate out of control but chose to sell them anyway.  Two NHTSA investigations concluded that a simultaneous, undetectable failure of the cruise control and the brakes is virtually impossible.  Ford has evidence that if an electrical failure causes the vehicle to accelerate rapidly, pushing the brake pedal will disengage the cruise control and return the engine to idle.  Ford has produced evidence that even if the throttle remains wide open, the brakes are strong enough to stop the vehicle.  And finally, Ford points to evidence that most of these alleged incidents are caused by drivers accidentally pushing the gas pedal instead of the brake pedal.  Sudden

acceleration reports dropped when shift interlocks where introduced.  These devices prevent the driver from shifting into gear unless the brake pedal is depressed, which means the car is still in neutral if the driver accidentally presses the wrong pedal when getting underway.

Friedl, on the other hand, points to evidence that Ford engineers concluded that the engine no longer produces vacuum when it is at WOT, or may lose vacuum for other reasons.  Pl. Ex. 9 at 2.  This could account for the seeming impossibility of a simultaneous brake failure and cruise control failure that causes the engine to race.  In an email to Scott Simpson, a manager of Ford Powertrain Electronics Systems and Applications, Ford engineer Casey Mulder wrote:

> If you lose vacuum, or the engine goes to WOT you will have one press of the brakes with assist.  The next time you hit the brake you will have SUBSTANTIALLY less braking power since the brakes are power assist.  If this occurs it becomes EXTREMELY difficult to push hard enough to open the brake pressure switch.  I was pushing as hard as I could and almost couldn't do it.  (my lunch time workouts helped in this regard!) [sic].  So in this scenario, if a customer pumps the brake once or twice and he's at WOT he's in BIG trouble. . . So if a "event" [sic] occurred where speed control went to WOT and for some reason pin 4 were grounded, incidents just as described by customers could occur.

Pl. Ex. 9 at 2-3 (emphasis in original).

After considering the evidence that Ford was aware of the sudden acceleration problem related to its cruise control design and continued to sell vehicles without modifying the cruise control, the court finds that Friedl has

raised a question of material fact for the jury to determine as to whether Ford acted with presumed malice.  See Forrest, 285 F.3d at 691.  A reasonable jury could believe Friedl's version of the facts rather than Ford's.

Ford contends that it is not liable for any allegedly malicious actions of its employees because Friedl has not shown that anyone acting on behalf of Ford believed that the cruise control was defective.  In determining whether a principal may be liable for punitive damages for the actions of its agents or employees, South Dakota follows the complicity rule enunciated in the Restatement (Second) of Torts § 909.  Dahl, 474 N.W.2d at 903.  Under the complicity rule, punitive damages may be awarded against a master or other principal because of an act by an agent if "the agent was employed in a managerial capacity and was acting in the scope of employment."  Id.  Much of the evidence that raised a jury question as to whether Ford was aware of cruise control problems consists of discussions between engineers and their supervisors, engineers and Ford dealers, complaints from customers to Ford, and alleged sudden acceleration incidents involving a Ford vice-president and Ford's CEO.  Because supervisors, engineers, and corporate executives may be employed in a managerial capacity, Friedl has at least raised a jury question as to whether these Ford employees qualify as agents employed in a managerial capacity.

Ford argues that if SDCL 21-3-2 permitted an award of punitive damages, it would be unconstitutionally vague under the Due Process Clause as applied to this case.  Ford contends that the statute fails to give Ford reasonable notice of what conduct would be prohibited, and it would permit arbitrary enforcement by plaintiffs and their attorneys.  The South Dakota Supreme Court has held that "[o]ur statutes controlling punitive damages are presumed to pass a due process challenge until it appears clearly, palpably and plainly that they do not."  Schaffer v. Edward D. Jones & Co., 552 N.W.2d 801, 814-15 (S.D. 1996).  In order to withstand a vagueness challenge, the law must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited and provide explicit standards for its enforcement.  Thorburn v. Austin, 231 F.3d 1114, 1120 (8th Cir. 2000).  In this case, Ford allegedly sold a large SUV that it knew may accelerate out of control at any given moment during the life of the product.  Given the inherent dangers of a rapidly accelerating vehicle to motorists or pedestrians and the large number of vehicles that Ford sold with the alleged defect, a person of ordinary intelligence should be aware that knowingly distributing such vehicles could cause legal problems.

In Davis v. Merrill, Lynch, Pierce, Fenner, & Smith, Inc., 906 F.2d 1206, 1226-27 (8th Cir. 1990), the Eighth Circuit Court of Appeals held that South Dakota's punitive damages law complied with the Due Process Clause because

16

it provided adequate procedural safeguards and clear standards for reviewing the jury's award.  See also Flockhart, 467 N.W.2d at 479 (adopting five factor test to determine whether punitive damages award is appropriate).  Under this test, the jury considers:

1. The amount allowed in compensatory damages;
2. The nature and enormity of the wrong;
3. The intent of the wrongdoer;
4. The wrongdoer's financial condition; and
5. All of the circumstances attendant to the wrongdoer's actions.

Schaffer, 552 N.W.2d at 810.  This test provides guidance for jury deliberations and the court's review of the award.  Id.  Thus, the court finds that South Dakota's punitive damages statutes are not unconstitutionally vague because they apply clear standards and gave Ford sufficient notice that its allegedly malicious acts could lead to a punitive damages award.  Accordingly it is hereby

ORDERED that Ford's motion for partial summary judgment (Docket 59) is denied.

Dated August 24, 2005.

BY THE COURT:

/s/ **Karen E. Schreier**
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE